# CHARLESTON.

HARRIS v. ORR *et al.*

Submitted February 4, 1899—Decided April 8, 1899.

1. ADMINISTRATOR—*Reasonable Care.*

   An administrator pursuing such course as a judicious man, looking alone to his worldly interests, would, under the circumstances, pursue in his own affairs will be justified in so doing. Ordinary care and reasonable diligence are what are required of him. (p. 262).

2. ADMINISTRATOR—*Suits—Security for Costs.*

   An administrator is not bound to sue upon a controverted, doubtful demand where he demands indemnity for costs and expense of the suit from those requesting suit, and it is not given. (p. 264).

3. PARENT AND CHILD—*Support of Parent.*

   If a father promises to pay a son for caring for and supporting him, it creates a valid demand in favor of the son. (p. 265).

Appeal from Circuit Court Doddridge County.

Suit by Jennie Harris against John P. Orr and others. Judgment for plaintiff, and Orr appeals.

*Reversed.*

JOHN BASSEL, for appellant.

W. S. STUART, for appellee.

BRANNON, JUDGE:

John P. Orr was appointed in July, 1891, administrator of W. H. Harris, and this is a suit by Jennie Harris, widow of said Harris, against Orr, to settle his accounts as administrator, and to charge him with assets which, by neglect, he had not collected, among them, with certain money found on the person of Harris after death, and which went into the hands of a son, A. B. Harris, and his wife, and was converted to their own use by them and another son, W. B. Harris. The commissioner and the court's decree charged this money, as well as some other, to Orr, and he appeals.

A demurrer to an amended bill was overruled, and of this Orr complains. The point made to sustain this demurrer is that the bill only charges "that the administrator has refused to collect, and to institute proceedings for the purpose of collecting and getting possession of, the personal estate of said W. H. Harris." It is said this is vague, and that the bill does not charge that Orr failed to collect solvent debts, or that debts which were collectible had been lost by want of diligence; but this bill does do this. It specifies certain debts on certain persons, and alleges that this money was found on the body of the dead man, and taken possession of by A. B. Harris and wife, and that they and another son, W. B. Harris, entered into a conspiracy for the purpose of fraudulently concealing and converting it to their sole use, with intent to cheat the widow out of her share; and that the administrator knew of this conspiracy, and acquiesced in it, and that, though requested by distributees to sue A. B. Harris and W. B. Harris for the money, he failed and refused to do so, and that the demand was solvent when the administrator qualified, but had been lost by reason of subsequent insolvency. I think the bill good.

Next, as to the merits. The proposition of the plaintiff is to make Orr pay out of his own pocket, money which he never received,—the money on the person of the deceased at his death. To do so requires quite a strong showing. We must find him guilty of gross neglect in not suing for it. Let us see what degree of diligence the law exacts of personal representatives. "Executors pursuing such a

course in the management of the testator's assets as a judicious man, looking alone to his worldly interests, would, under the circumstances, pursue in his own worldly affairs, will be justified in so doing." *Kee's Ex'rs* v. *Kee's Creditor*, 2 Grat. 117. Such is the general rule. *Rea* v. *Hampton* (N. C.) 9 Am. St. Rep. 21, note (s. c. 7 S. E. 649). Ordinary care and judgment, not the highest, are required of him. *Moose* v. *Eure* (N. C.) 7 S. E. 471. "Acting in good faith, within the requirements of law, executors and administrators will be treated by the court with liberality and tenderness. They will not be held responsible for losses in the absence of willful misconduct or fraud, especially when acting under advice of counsel. The executor will not, in such cases, be held responsible for mere error of judgment. And where he has acted with what men of sense and experience would deem reasonable discretion in their own affairs, his acts and omissions in good faith will not render him liable for losses arising in consequence, especially during a period of doubt and difficulty. He is not to be held liable as an insurer of the estate." 2 Woerner, Adm'n, § 336. W. H. Harris was an old man of seventy-six years when he died, April 16, 1891. Three years before, he married a young girl of eighteen years, who shortly left him, and returned to her home. Harris was paralyzed, and was taken to the home of his son A. B. Harris, where he lay for about a year, utterly helpless, a large man of over two hundred pounds weight, needing the greatest constant attention, often lifted from his bed ten times a night; and was watched, supported, and cared for by A. B. Harris and his wife, and another son, W. B. Harris, a single man, who had his home at the house of his brother, A. B. Harris. When the old man died, a belt containing six hundred dollars in gold and one hundred dollars currency was taken from his person, and handed by the person who took it from his person to Mrs. A. B. Harris by direction of her husband. There is evidence tending to show that this money was put in a chest, and in a few days was stolen,—at least disappeared,—but does not seem to be further accounted for. It is claimed that the two brothers, A. B. and W. B. Harris, got and converted this money to their own use, and it

is for negligence in not suing them as administrator and collecting this money that Orr is charged with the whole sum and interest. Do the facts charge him under the above principles of law? Was this alleged demand in favor of Harris' estate of such character as called on Orr to sue, or was it so doubtful as will excuse him from suing, either because of doubt of recovery of judgment or from insolvency of the parties? Schouler, Ex'rs, § 274, states the law to be that: "The duty to pursue or collect depends largely upon the sperate or desperate character of the claim itself; as to whether, for instance, the title of the deceased to such a corporeal thing or muniment can be clearly established against the adverse possessor or the reverse; or again, whether such a claim or debt is probably collectible or not considering the debtor's own solvency. A representative is not chargeable for assets without reference to the fact whether they were good, doubtful, or desperate when he assumed the trust, nor in any case aside from the question of delinquency or culpable neglect on his part in realizing their value, or procuring them according to the means at his disposal. No executor or administrator is bound to sue on a worthless debt, but ordinary care and diligence is the true criterion of his duty." Now, that this money disappeared is certain. If it did not come to the hands of the two sons, they would not be liable. If they did not get it, whom would Orr sue? The mere fact that it was taken from the dead man, and handed to Harris and wife, would not, if stolen by others, create a liability upon them. If Orr sued, he ran a risk of the evidence in this record to show that it was stolen. But suppose the money was not stolen, but went to the hands of the two sons. They claimed it. They prove, not merely by themselves, but by disinterested witnesses, that their father agreed and contracted with them that they were to have all the property he had for supporting and maintaining him. He had but a small quantity of rough, worn, country house furniture, which he gave to a daughter-in-law and a granddaughter, and a note of one hundred dollars on Nutter, his son-in-law, which he hardly expected him to pay, as Nutter had taken him and his illegitimate child some time prior to this into his house, and kept them for months under promise

of pay, as evidence goes to show, and a debt of ten dollars on Powell and twenty-five dollars on Orr. The Nutter and Powell notes never came to Orr's hands. Reflect that this old man was a paralytic, gross in weight, a child, and utterly helpless, and that these two sons and the family of one lifted him from bed, watched over him day and night for a year, exhausted themselves, and his young wife, now suing for her thirds, had abandoned him in his terrible condition. What more natural or probable than that he did say to his sons that, if they would keep and support and care for him, they should have this money for pay? And who more entitled to it? They alone watched him in his helpless, dying days. Other children and the wife did not do so. This is a contract. They could not recover anything without that promise; but as the claim for compensation is so highly meritorious when compared with the right of the wife and other children, courts readily listen to the old man's declarations promising his sons to pay them. This is clearly proven. He frequenly declared to neighbors around him that all his personalty was to go to these sons. This is not a gift. If it were, delivery of the money would likely be necessary to effectuate it as a gift *inter vivos* or *donatio mortis causa*. *Smith* v. *Zumbro*, 41 W. Va. 623, (24 S. E. 653). But, if a father promise to pay a son for keeping him, it is a valid debt. *Riley* v. *Riley* 38 W. Va. 283, (18 S. E. 569); *Cann* v. *Cann*, 40 W. Va. 138, (20 S. E. 910); *Place* v. *Darst*, 42 W. Va. 67, (24 S. E. 580). I think it is shown that once this money was in A. B. Harris' hands, when he brought it from the bank, and received some of it. The old man told witnesses that it was the boys' money, but that he preferred to keep it on his person, as the sons, or one of them, was inclined to drink, and might waste it. The old man told Orr that the money belonged to the sons. This is not competent evidence for Orr, but bears on his honest intention in the matter, and tells us why any man might not sue, when he had been told by the old man himself that it was not his own money; the more so when in a suit he could be used as a witness in behalf of the sons to prove for them these declarations. No one but Riggs, husband of one of the distributees, demanded a suit. He had no interest. His

wife told Orr not to sue. Another daughter, Mrs. Nutter, and her husband, told him not to sue. I think it true that an attorney for the widow asked Orr to sue. Orr went to these two sons, demanded of them all property and estate of their father, and was informed that he had left none; that what he had belonged to them. Now, can we charge Orr with gross negligence, under these circumstances, in not suing? The record shows that if he had sued he would have met with bitter and prolonged resistance, and that the result would have been doubtful. · The evidence to defeat a suit is very considerable, to say the least. Would not a prudent man have hesitated to bring so doubtful a suit in his own case?

Next, as to solvency. Before we make Orr pay this seven hundred dollars, we must be able to say that it was collectible, but was lost through his neglect. It is shown that A. B. and W. B. Harris had two tracts of seventy-two and fifty acres, and that on the 17th of August, 1891, A. B. Harris mortgaged the seventy-two acres to a building association for five hundred and twenty dollars, and that on the 25th of February, 1892, they mortgaged both tracts to the association for a further loan of two hundred and sixty dollars, showing they were borrowing, and that these large liens were on the land, before judgment could have been gotten by Orr. It is shown that when their father died, in 1891, they owed many other debts, and that they were bankrupt. Judgments began to go against them in 1893, and the lands were sold for these debts, and brought one thousand one hundred and sixty-six dollars and fifty-four cents, leaving a large indebtedness unpaid. Now, this decree makes Orr pay the whole seven hundred dollars and one hundred and sixty-four dollars and ninety-four cents interest, when these lands would not have paid those sums after the two fixed liens or the first lien alone. The Harrises had no other attainable estate, as executions were returned "No property." But I repeat, though at the qualification of Orr there were no judgments, yet the Harrises were overwhemled in debt, and judgments soon went against them. Now, we are asked to assert and hold that if Orr had sued, he would have got judgment before all other judgments and made the money. We can

not say so, because (1) the judgment could not have been·
paid in full after one or both mortgages; (2) because we
may fairly say that Orr's suit would have been litigated
long in the circuit court, and that these divers debts of
others would have been thereby hastened to suit before a
justice, as they were, and thus had precedence. Under
these circumstances, it does seem to me that we cannot
liken this doubtful, controverted claim to a plain note or
other uncontroverted, solvent demand, and charge it on Orr.
I refer to what is said as to good faith and error of judgment
of fiduciaries in *Windon* v. *Stewart*, 43 W. Va. 711, 714,
(28 S. E. 776). But this is not the sole defense of Orr.
His conduct seems to show good faith. He did not refuse
to sue, but when requested by Riggs to sue, he promptly
said he had no means to carry on the suit, but, if they
would indemnify him against expense and the outlay, he
would sue at once. He always said so. The twenty-five dol-
lars he himself owed the estate was the only means to em-
ploy lawyers, get witnesses, pay fees, pay his own hotel
bills and service, to encounter a suit sure to be fought to
the end, as this record fairly shows. The two sons resisted
the demand from the beginning. "Executors are not
bound to enforce doubtful claims at the expense of the
estate. But if the heirs will give them indemnity for the
costs, it is their duty to assert such claims." *Griswold*
v. *Chandler*, 5 N. H. 492. This shows he may demand in-
demnity to protect the estate, even if it has assets available
for the suit; but Orr had none at all. "An executor is
not bound to enforce a doubtful claim merely because
some of the heirs may think it well founded," unless in-
demnity is given. *Sanburn* v. *Goodhue*, 28 N. H. 48, 58.
This right to indemnity is held in *Utley* v. *Rawlins*, 22
N. C. 438; *Harrington* v. *Keteltas*, 92 N. Y. 45; *Hepburn*
v. *Hepburn*, 2 Brandt. Sur. 74, and *Andrews* v. *Tucker*, 7
Pick. 250. 2 Woerner, Adm'n, § 324, lays this right to in-
demnity down as good law. In reference to it, Schouler,
Ex'rs, § 273, says: "The duty of an executor and admin-
istrator to pursue and recover chattels depends in great
measure upon the means at his command for so doing, and
the same may be said respecting the collection of dues to
the estate. Whether slender assets shall be used in liti-

gation for procuring personal property adversely held, or in realizing doubtful claims, the rule of prudence must decide; but it is certain that the representative of an estate is not bound to litigate or undertake the enforcement of doubtful rights on behalf of the estate out of his own means; and if kindred, legatees, or others interested in prosecuting the right think the effort worth making, they should at least offer to indemnify the representative against cost." And Orr had right to demand indemnity to protect himself and the estate, the more especially as two of the heirs told him not to sue. Decree reversed because it charges Orr with the seven hundred dollars, and case remanded.

*Reversed.*